

U.S. DISTRICT COURT
FILED

SEP 02 2014

WP
S.D. OF N.Y.

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

EDWIN SEGOVIA and JUNIOR HERMIDA,
on behalf of themselves and all others
similarly situated,

     Plaintiffs,

v.

VITAMIN SHOPPE, INC.,

     Defendant.

_____/

CASE NO.:

**14 CIV. 7061**

**CLASS ACTION COMPLAINT**

**JURY TRIAL DEMANDED**

**JUDGE ROMAN**

## CLASS ACTION COMPLAINT

  Plaintiffs, Edwin Segovia and Junior Hermida, by and through undersigned counsel, bring

this action on their own behalf and on behalf of a Class and Subclasses of persons defined herein,

against Defendant Vitamin Shoppe, Inc., and for their Complaint allege, upon information and

belief and based on the investigation to date of their counsel, as follows:

### INTRODUCTION

  1.  This is a class action brought individually by Plaintiffs and on behalf of a class of

persons similarly situated, ("Class Members"), who purchased the dietary supplements BodyTech

Whey Tech Pro 24, BodyTech 100% Casein, and BodyTech Primal Pro ("Products") from

Defendant. Defendant's efficacy claims for the Products are false.

  2.  Protein supplements are an extremely competitive and rapidly growing industry.

From 2013 to 2018, the market for protein products is expected to grow by 62% to reach $7.8

billion. Euromonitor International, *Sports Nutrition in the US* (May 2014), *available at*:

http://www.euromonitor.com/sports-nutrition-in-the-us/report.

3.      Defendant Vitamin Shoppe, Inc. advertises, manufactures, markets, sells, and distributes the Products, which are sold in the growing and extremely competitive fitness industry as highly digestible protein products.  Although Defendant boasts about the Products' efficacy in labeling and advertising the Products, Defendant dramatically under-doses the digestive enzyme Aminogen® and falsely claims that lactase helps aid in the absorption and digestion of protein, such that none of the promised benefits are or can be delivered by the Products.

4.      As a result of Defendant's unfair, deceptive, fraudulent, unfair, and misleading practices, Plaintiffs and Class Members have been unfairly deceived into purchasing the Products, which otherwise they would not have purchased or would have purchased only at a price substantially lower than that charged by Defendant.

## JURISDICTION AND VENUE

5.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332(d)(2) (diversity jurisdiction) and the Class Action Fairness Act, in that (i) there is complete diversity (Plaintiffs Segovia and Hermida are citizens of New York and Florida, respectively, and Defendant is domiciled and incorporated in New Jersey and otherwise maintains its principal place of business in New Jersey), (ii) the amount in controversy exceeds $5,000,000.00 (Five Million Dollars) exclusive of interests and costs, and (iii) there are 100 or more members of the proposed Plaintiff class.

6.      Defendant conducts substantial business in both New York and Florida, including the sale and distribution of the Products, and has sufficient contacts with New York and Florida or otherwise intentionally avails itself of the laws and markets these states, so as to sustain this Court's jurisdiction over Defendant.

7.      Venue lies in this District, pursuant to 28 U.S.C. §1391, because a substantial part of the events or omissions giving rise to Plaintiff Segovia's claims occurred in this Judicial District.  In addition, Defendant does business and/or transacts business in this Judicial District, and therefore, is subject to personal jurisdiction in this Judicial District and resides here for venue purposes.

## PARTIES

8.      Plaintiff Edwin Segovia is a resident and citizen of Beacon, Dutchess County, New York.  Plaintiff purchased BodyTech Whey Tech Pro 24, manufactured and marketed by Defendant, on or about March 3, 2014, through Defendant's website www.vitaminshoppe.com.

9.      Plaintiff Junior Hermida is a resident and citizen of Naples, Collier County, Florida.  Plaintiff purchased the BodyTech Whey Tech Pro 24 and BodyTech 100% Casein, manufactured and marketed by Defendant, on or about November 14, 2013, at a Vitamin Shoppe store located in Lee County, Florida.

10.      Vitamin Shoppe, Inc. is a New Jersey corporation headquartered at 2101 91st Street, North Bergen, New Jersey.  Vitamin Shoppe is a retailer of nutritional products and sports supplements as well as herbs, homeopathic remedies, and beauty aids.  The company currently sells its products through more than 500 stores located in 38 states and Puerto Rico, as well as through internet sales.

11.      Defendant designed, tested, manufactured, marketed, advertised, warranted, and/or sold the Products in Florida and throughout the United States.

12.      During the Class period, Plaintiffs and Class Members purchased the Products through Defendant's website www.vitaminshoppe.com and/or one of Defendant's many brick and

mortar locations.  Plaintiffs and Class Members suffered an injury in fact caused by the false, fraudulent, unfair, deceptive, and misleading practices set forth in this Complaint.

## FACTUAL ALLEGATIONS

13.     Vitamin Shoppe is a retailer of nutritional products and sports supplements as well as herbs, homeopathic remedies, and beauty aids.  The company currently sells its products through the internet and more than 500 stores located in 38 states and Puerto Rico.

14.     Defendant has sold thousands of units of the Products either on its website or through its retail outlets throughout the United States.

15.     Plaintiffs reviewed the Products' labels and all of the other representations made by Defendant that are set forth herein prior to purchasing the Products.

16.     Defendant knowingly employs a common scheme of under-dosing the ingredient Aminogen® in all of the Products and falsely claiming that lactase aids in the absorption and digestion of protein.

17.     Defendant's claims are false and misleading based on the omission of the material facts described below.

18.     Defendant licenses the use of the ingredient Aminogen® from Triarco Industries, Inc. and had all relevant information regarding the ingredient's clinical trials made available to them.

19.     Under information and belief, Defendant had access to but knowingly and/or recklessly ignored all competent and reliable scientific evidence regarding the Products' ingredient Aminogen®.

20.     Defendant, unapologetically and with no remorse, boasts about the inclusion of Aminogen® in the Products, but then under-doses it in the formula to make the ingredient useless.

—4—

21.     Under information and belief, Defendant had access to but knowingly and/or recklessly ignored all competent and reliable scientific evidence regarding the Products' ingredient lactase.

22.     Defendant made false claims regarding the function of lactase in the body.

### *The Products' False and/or Misleading Labeling and Marketing Claims Regarding Aminogen® and Lactase*

23.     Defendant prominently includes the Aminogen® name and trademark symbol on the front of the Products' labels:



24.     Defendant makes the following false and misleading labeling and marketing claims[1] with respect to the Product Whey Tech Pro 24: "Whey Tech Pro 24 is enhanced with lactase as well as Aminogen®, a patented protein enzyme blend," and "This grouping of enzymes

---

[1] The description of the Products' labels is identical to the product information given by Defendant on their website.

may help aid in the absorption and digestion of protein."



Whey Tech Pro 24 fuels your body with 24 grams of high quality protein per serving! Add Whey Tech to your dietary and exercise regimen, and you'll be benefiting from an important combination of whey protein isolates, concentrates, and peptides. All are engineered to provide you with the building blocks needed to develop metabolically active lean muscle tissue. In addition, whey protein has a high biological value and high concentration of the branched chain amino acids (BCAA's): leucine, isoleucine, and valine. Research continues to show the benefit of BCAA's in muscle recovery and growth.

• Although consuming adequate protein has been shown to lead to positive nitrogen balance and added muscle growth, when combined with a resistance training program, proper protein utilization and digestion must occur in the body for this to happen. Whey Tech Pro 24 is enhanced with lactase as well as Aminogen®, a patented protein enzyme blend. This grouping of enzymes may help aid in the absorption and digestion of protein.

• Whey Tech Pro 24 is available in delicious vanilla, chocolate, chocolate mint and banana flavors.



25.    Defendant makes the following false and misleading labeling and marketing claims with respect to the Product 100% Casein: "Enhanced with Aminogen®, an enzyme that helps your body breakdown protein" and "Enhanced with Aminogen®, an enzyme that helps your breakdown and absorb protein."



26.    Defendant uses the false and misleading labeling and marketing claim with respect to the Product Primal Pro: "Aminogen® to help support amino acid absorption and nitrogen retention from whey protein":



These statements have not been evaluated by the Food and Drug Administration. This product is not intended to diagnose, treat, cure or prevent any disease.

### Primal Pro™

**Fuel to Support Lean Muscle Mass**

Time to take it to the next level. Primal Pro™ was formulated for serious athletes looking to unlock their primal potential in the gym or advance their performance on the court or field. With 30 grams of protein, Primal Pro™ saturates your muscles with the nutrients necessary to build lean mass.

Contains:

* 30 grams of high quality protein from whey isolate, casein and hydrolyzed whey, providing a steady flow of amino acids to the bloodstream

* A blend of creatine monohydrate and Creatine MagnaPower®, a chelate of creatine and magnesium

* A lipid blend of Conjugated Linoleic Acid (CLA), Flaxseed and Medium Chain Triglycerides

* AncienThin®, a combination of healthy grains

* Aminogen® to help support amino acid absorption and nitrogen retention from whey protein

*Why Defendant's Labeling and Marketing Claims are*
*False and/or Misleading Regarding Aminogen®*

27.     The use of the Aminogen® name and trademark on the Products' labels is misleading to consumers because the pronouncement of the inclusion of Aminogen® clearly intends to deceive consumers into believing the Products contain effective doses of Aminogen®, which they do not.

28.     Defendant's Product Whey Tech Pro 24 contains 24 grams of protein and 25 mg of Aminogen® per serving:

–8–

Whey protein isolate, whey protein concentrate, glutamine peptides, cocoa powder, natural and artificial flavors, xanthan gum, salt, acesulfame potassium, sucralose, Aminogen and lactase. Each serving provides 25 mg of a proprietary Enzyme Blend consisting of Aminogen and lactase.

http://www.vitaminshoppe.com/p/bodytech-whey-tech-pro-24-chocolate-mint-5-15-lb-powder/vs-2547?sourceType=sc&source=FG&adGroup=20-40&keyword=VS-2547&cm_mmc=Google+Shopping-_-Product+Listing+Ads-_-20-40-_-VS-2547&gclid=CIGR9MyQ6rwCFe1cMgodSS0ALA&gclsrc=aw.ds#.Uw4LMfldW7k

29.    Defendant's Product 100% Casein contains 24 grams of protein, and under information and belief, 25 mg or less of Aminogen® per serving.

30.    Defendant's Product Primal Pro contains 30 grams of protein, and under information and belief, 25 mg or less of Aminogen® per serving.

31.    Triarco Industries, Inc. is the patent holder and licensor of Aminogen® and licenses the ingredient to Defendant.

32.    Defendant relies on two studies when making their false and misleading claims regarding Aminogen®. (Exhibits A and B).

33.    These two studies are the only clinical studies on Aminogen®.

34.    In the first study, entitled "An open label study to determine the effects of an oral proteolytic enzyme system on whey protein concentrate metabolism in healthy males", the lowest clinical dosing used in the study was 2.5 grams of Aminogen®, combined with 50 grams of whey protein concentrate. (Exhibit A).

35.    In the second study, entitled "A Double-Blind Clinical Study to Investigate the Effects of a Fungal Protease Enzyme System on Metabolic, Hepato-renal, and Cardiovascular Parameters Following 30 Days of Supplementation in Active, Healthy Men", the clinical dosing

used was 3% Aminogen® in a supplementation of 40 grams of whey protein, which is approximately 1.2 grams of Aminogen® per 40 grams of whey protein. (Exhibit B).

36.     Defendant's dosing of 25 mg or less of Aminogen® per serving of the Products is a fraction of the clinical dosing needed to provide the efficacy claims made by Defendant.

37.     The clinically effective dosing of Aminogen® is 3-5% of the protein intake.

38.     Defendant uses a dosing protocol of less than 0.1% of Aminogen® as part of the protein content in all Products.

39.     At the maximum, Defendant's Products contain 1/30 of the known clinically effective dosage of Aminogen®.

40.     Given the Products' dosing protocols and the omission of material facts regarding clinically effective dosages, it is impossible for the Products to live up to the labeling and marketing claims contained herein, making Defendant's claims about the Products false and/or misleading.

### *Why Defendant's Labeling and Marketing Claims are*<br>*False and/or Misleading Regarding Lactase*

41.     While the addition of lactase to the Products may certainly aid in the digestion and absorption of carbohydrates, it plays no biochemical/metabolic role in protein digestion and absorption.

42.     To highlight the dichotomy of these two separate digestive systems (protein and carbohydrate), a brief explanation is below.

43.     Part of the β-galactosidase family of enzymes, Lactase (also known as lactase-phlorizin hydrolase or LPH) is a glycoside hydrolase involved in the hydrolysis of the disaccharide lactose into constituent galactose and glucose monomers.

—10—

44.    Lactase is an enzyme produced in the digestive system of humans and is predominantly present along the brush border membrane of the differentiated enterocytes lining the villi of the small intestine[2].

45.    Lactase is essential to the complete digestion of whole milk. Lactase breaks down lactose, a complex sugar (carbohydrate) that gives milk its sweetness. As a large sugar compound, lactose cannot be absorbed naturally by the body. In order to metabolize this form of sugar, the body needs lactase to break down lactose into two smaller particles, glucose and galactose. These smaller sugars are more easily absorbed by the cells in the intestine. Without lactase, lactose remains in the digestive tract and cannot be used by the body. Without lactase, a person consuming dairy products may experience the symptoms of lactose intolerance. Lactase can be purchased as a food supplement and is added to milk to produce "lactose-free" milk products.

46.    Lactase nonpersistence (or lactase insufficiency) results in incomplete digestion of an ingested load of lactose; hence, lactose is malabsorbed and reaches the colon. If sufficient amounts of lactose enter the colon, a subject may experience symptoms of abdominal pain, bloating, excess flatulence, and diarrhea, a condition known as lactose intolerance[3].

47.    Some people are unable to produce enough lactase to meet their metabolic needs. In some cases, the lactase enzyme is totally absent. These people are said to be suffering from

---

[2] Skovbjerg H, Sjöström H, Norén O (March 1981). Purification and characterisation of amphiphilic lactase/phlorizin hydrolase from human small intestine. Eur. J. Biochem. 114 (3): 653–61.

[3] Wilt TJ, Shaukat A, Shamliyan T, Taylor BC, MacDonald R, Tacklind J, Rutks I, Schwarzenberg SJ, Kane RL, and Levitt M. Lactose Intolerance and Health. No. 192 (Prepared by the Minnesota Evidence-based Practice Center under Contract No. HHSA 290-2007-10064-I.) AHRQ Publication No. 10-E004. Rockville, MD. Agency for Healthcare Research and Quality. February 2010.

lactase deficiency, or lactose intolerance[4], and lactase supplements can benefit people who suffer from lactose intolerance.

48.     According to MedlinePlus, a service of the National Institutes of Health, symptoms of lactase deficiency begin 30 minutes to 2 hours after ingesting milk or similar dairy products. Symptoms include bloating of the stomach, abdominal cramps, flatulence, nausea, and diarrhea.

49.     Whereas carbohydrate metabolism begins in the mouth, protein digestion begins in the stomach, chiefly by the action of the hydrochloric acid that is produced there and by the pepsin enzyme.

50.     Some seven or more factors influence how fast the enzymes act on the protein. These factors include the concentration of the enzyme, that is, how much of it is present; the amount of protein food needing action; the acidity of the food and of the stomach; the temperature of the food; time; and the presence of any digestion inhibitors, such as antacids.  Cooking and chewing may help, but protein digestion does not begin in the mouth, as carbohydrate metabolism does.

51.     Hydrochloric acid in the stomach is required to break the protein bonds.  The protein-containing foods are broken apart, separating out the protein, and then the proteins are broken into their constituent parts, the amino acids.

52.     Protein digestion continues in the upper portion of the small intestine under the action of the pancreatic protein enzymes, trypsin and chymotrypsin.  The amino acids are absorbed by the blood capillaries of the small intestines, carried through the liver, and then go into the blood

---

[4] Järvelä I, Torniainen S, Kolho KL (2009). Molecular genetics of human lactase deficiencies. Ann. Med. 41 (8): 568–75.

of the general circulation.

53.     The enzyme lactase plays no role in the absorption and digestion of proteins.

## RELIANCE AND INJURY

54.     When purchasing the Products, Plaintiffs were seeking products that had the qualities described in Defendant's advertising, labeling, and marketing.

55.     Plaintiffs read and relied on the deceptive claims contained therein.

56.     Plaintiffs believed the Products had the qualities they sought, but the Products were actually unsatisfactory to Plaintiffs for the reasons described herein.

57.     Plaintiffs paid more for the Products—and would not have been willing to purchase the Products at all—absent the false and misleading labeling complained of herein.  Plaintiffs would not have purchased the Products absent these claims and advertisements.

58.     For these reasons, the Products were worth less than what Plaintiffs paid for them.

59.     Instead of receiving products that had actual and substantiated healthful or other beneficial qualities, the Products Plaintiffs received were ones that did not provide the claimed benefits.

60.     Plaintiffs lost money as a result of Defendant's deceptive claims and practices in that they did not receive what they paid for when purchasing the Products.

61.     Plaintiffs altered their position to their detriment and suffered damages in an amount equal to the amount they paid for the Products.

## CLASS ACTION ALLEGATIONS

62.     Plaintiffs bring this class action on behalf of themselves and all others similarly situated as Class Members pursuant to Rule 23 of the Federal Rules of Civil Procedure.

63.     Plaintiffs seeks to represent a "National Class" defined as follows:

**All United States residents who purchased BodyTech Whey Tech Pro 24, BodyTech 100% Casein, or BodyTech Primal Pro, excluding Defendant; Defendant's officers, directors, and employees; Defendant's subsidiaries; those who purchased the products for the purpose of resale; the Judge to whom this case is assigned; and the immediate family of the Judge to whom this case is assigned.**

64.     Plaintiff Segovia seeks to represent a "New York Subclass" defined as follows:

**All New York residents who purchased BodyTech Whey Tech Pro 24, BodyTech 100% Casein, or BodyTech Primal Pro excluding Defendant; Defendant's officers, directors, and employees; Defendant's subsidiaries; those who purchased the products for the purpose of resale; the Judge to whom this case is assigned; and the immediate family of the Judge to whom this case is assigned.**

65.     Plaintiff Hermida seeks to represent a "Florida Subclass" defined as follows:

**All Florida residents who purchased BodyTech Whey Tech Pro 24, BodyTech 100% Casein, or BodyTech Primal Pro excluding Defendant; Defendant's officers, directors, and employees; Defendant's subsidiaries; those who purchased the products for the purpose of resale; the Judge to whom this case is assigned; and the immediate family of the Judge to whom this case is assigned.**

66.     Plaintiffs are members of the Class that they seek to represent.  Plaintiffs are United States residents who purchased the Products.

67.     Plaintiff Segovia is a member of the Subclass that he seeks to represent.  Plaintiff is a New York resident who purchased the Products.

68.     Plaintiff Hermida is a member of the Subclass that he seeks to represent.  Plaintiff is a Florida resident who purchased the Products.

69.     The definition of the Class is narrowly tailored so as to include only identifiable Class Members who can be identified through Defendant's sales information.  The Class has no

–14–

time limit because, as discussed below, the statute of limitations has been tolled by the Defendant's fraudulent concealment of the true nature of the Products purchased by Class Members.

70.     The proposed Class is so numerous that the individual joinder of all its members, in this or any action, is impracticable.  The exact number and identification of the members of the Class is presently unknown to Plaintiffs, but it is believed to comprise hundreds or thousands of New York and Florida residents, and many thousands of United States residents, thereby making joinder impractical.

71.     Common questions of fact and law exist as to all Class Members and predominate over questions affecting only individual members.  These include, but are not limited to, the following:

a.     Whether the Products, in their normal and customary use by consumers, work as advertised, marketed, and conveyed to consumers;

b.     Whether, in the course of business, Defendant represented that the Products have characteristics, uses, benefits, or qualities that they do not have when used in a customary manner by consumers;

c.     Whether the claims Defendant made and is making regarding the Products are unfair or deceptive, specifically, whether lactase aids in the digestion and absorption of proteins and whether the Products, when used by consumers in a customary manner, provide an effective dosage of Aminogen®.

d.     Whether Defendant knew at the time the consumer transactions took place that consumers would not receive the promised benefits of the Products that Defendant was claiming consumers would receive;

e.     Whether Defendant knowingly made misleading statements in connection with consumer transactions that consumers were likely to rely upon to their detriment;

f.     Whether Defendant knew or should have known that the representations and advertisements regarding the Products were unsubstantiated, false, and misleading;

g.     Whether Defendant has breached express warranties in the sale and marketing of the Products;

h.     Whether Defendant has been unjustly enriched by the sale of the Products to the Plaintiffs and Class;

i.     Whether the Plaintiffs and Class Members who purchased the Products suffered monetary damages and, if so, what is the measure of those damages;

j.     Whether Plaintiffs and Class Members are entitled to an injunction, damages, restitution, equitable relief, and other relief deemed appropriate, as well as the amount and nature of such relief.

72.     Plaintiffs' claims are typical of the claims of the Class Members. Plaintiffs and all Class Members purchased the Products, which were designed, tested, manufactured, marketed, advertised, warranted, sold, and/or placed in the stream of commerce by Defendant. Plaintiffs and which could not perform anywhere near advertised.

73.     The factual bases of Defendant's misconduct are common to the Class Members and represent a common thread of deceptive advertising and breaches of warranty resulting in injury to all Class Members. Plaintiffs are asserting the same rights, making the same claims, and seeking the same relief for themselves and all other Class Members. The central question of whether Defendant's representations are accurate and truthful is common to all Class Members and predominates over all other questions, legal and factual, in this litigation.

74.     Plaintiffs are adequate representatives of the proposed Class because they are Class Members and do not have interests that conflict with those of the other Class Members they seek to represent. Plaintiffs are represented by experienced and able counsel, who have litigated

numerous class-action lawsuits, and Plaintiffs' Counsel intend to prosecute this action vigorously for the benefit of the proposed Class. Plaintiffs and their Counsel will fairly and adequately protect the interests of the Class Members.

75. A class action is the superior available method for the efficient adjudication of this litigation because:

a. The prosecution of separate actions by individual Class Members would create a foreseeable risk of inconsistent or varying adjudications, which would establish incompatible results and standards for Defendant;

b. Adjudications with respect to individual Class Members would, as a practical matter, be dispositive of the interests of the other Class Members not parties to the individual adjudications or would substantially impair or impede their ability to protect their own separate interests;

c. Class action treatment will avoid the waste and duplication inherent in potentially thousands of individual actions and conserve the resources of the courts; and

d. The claims of the individual Class Members are relatively small compared to the burden and expense that would be required to individually litigate their claims against Defendant, so it would be impracticable for Class Members to individually seek redress for Defendant's wrongful conduct. Even if Class Members could afford individual litigation, the court system could not: Individualized litigation creates a potential for inconsistent and/or contradictory judgments and increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

76. A class action for injunctive and equitable relief pursuant to Rule 23(b)(2) of the Federal Rules of Civil Procedure is also appropriate. Defendant acted or refused to act on grounds

generally applicable to the Class, thereby making appropriate final injunctive and equitable relief with respect to the Class as a whole. Defendant's actions are generally applicable to the Class as a whole, and Plaintiffs, on behalf of the Class, seek the damages and injunctive relief described herein. Moreover, Defendant's systemic policy and practices make declaratory relief with respect to the Class as a whole appropriate.

**ESTOPPEL FROM PLEADING AND TOLLING OF
APPLICABLE STATUTES OF LIMITATIONS**

77. Defendant is estopped from relying on any statutes of limitation or repose by virtue of its acts of fraudulent concealment, which include Defendant's knowing concealment of the inefficacy of the Products' ingredients, while continuing to marketing the Products as containing clinically effective Aminogen® amounts and an additional ingredient that aids in the absorption and digestion of protein.

78. Defendant was and remains under a duty to Plaintiffs and the Class to disclose the facts, as alleged herein. The duty to disclose the true facts arises because, as the manufacturer, Defendant is in a superior position to know the true character and quality of its products, and Plaintiffs and Class Members, in the exercise of reasonable diligence, could not have discovered these true facts independently prior to purchasing the Products.

79. The facts concealed and/or not disclosed to Plaintiffs and the Class were material facts in that a reasonable person would have considered them important in deciding whether or not to purchase the Products.

80. Defendant intentionally concealed and/or failed to disclose the shortcomings of the Products for the purpose of inducing Plaintiffs and Class Members to act thereon.

81. Plaintiffs and Class Members justifiably acted upon, or relied upon to their

–18–

detriment, the concealed and/or non-disclosed material facts as evidenced by their purchase of the Products. Had they known of the true character and quality of the Products, Plaintiffs and Class Members would not have purchased (or would have paid less for) the Products.

82.      As a direct and proximate result of Defendant misconduct, Plaintiffs and Class Members have suffered actual damages. Defendant's conduct has been and is malicious, wanton, and/or reckless and/or shows a reckless indifference to the interests and rights of others.

## CAUSES OF ACTION

### COUNT I

### BREACH OF EXPRESS WARRANTY
### (On Behalf of the National Class or, alternatively, the New York and Florida Subclasses)

83.      Plaintiffs, individually and on behalf of all others similarly situated, readopt and incorporate by reference the allegations contained in paragraphs 1 through 82 as though fully set forth herein.

84.      Plaintiffs and Class Members each formed a contract with Defendant at the time they purchased the Products. The terms of the contract include the promises and affirmations of fact made by Defendant on the label of each of Defendant's Products, specifically, that the Products contain clinically effective Aminogen® amounts and that the Products' lactase content aids in the absorption and digestion of protein. Defendant's branding, labels, and advertising constitute express warranties, and are part of the basis of the bargain and a standard contract between Plaintiff, members of the Class, and Defendant.

85.      When they purchased the Products, Plaintiffs relied on the express warranties made by Defendant and the false and misleading claims contained therein.

86.    In fact, Defendant failed to disclose the material fact that the Products contained only a fraction of the clinically effective dose of Aminogen® and that the enzyme lactase has no role in the absorption and digestion of protein.

87.    The Plaintiffs and Class Members received a product that did not have an effective dose of Aminogen®.

88.    The Plaintiffs and Class Members received a product that contained lactase, which has no effect on protein absorption and digestion.

89.    These facts constitute breaches of all applicable express warranties as alleged in this complaint.

90.    Alternatively, privity was established between Plaintiffs/Class Members and Defendant/Defendant's agents, because Defendant was substantially if not completely responsible for the direct promotion and marketing Defendant's Products to Plaintiffs and Class Members, which led to Plaintiffs' and Class Members' purchase of the Products.  By virtue of this direct promotion and marketing, Defendant expressly warranted the Products' attributes and benefits to Class Members.

91.    Defendant breached the terms of the express warranty by failing to provide a product that provided the benefits promised.

92.    Plaintiffs relied on Defendant's affirmations regarding the specific benefits of lactase and the superior performance of alternative, less expensive, but equally effective sources of Aminogen®.

93.    As a result of Defendant's breaches of its express warranties, Plaintiffs and the Class have been damaged in an amount to be proven at trial.

94.     By reason of the foregoing, Plaintiffs, on behalf of themselves and all others similarly situated, demand judgment against Defendant for damages, including compensatory, incidental and consequential damages (excepting damages for personal injuries) for themselves and each Class Member.

## COUNT II

### FRAUD BY UNIFORM WRITTEN MISREPRESENTATION AND OMISSION
### (On Behalf of the National Class or, alternatively, the New York and Florida Subclasses)

95.     Plaintiffs, individually and on behalf of all others similarly situated, readopt and incorporates by reference the allegations contained in paragraphs 1 through 82 as though fully set forth herein.

96.     Defendant, uniformly and intentionally, willfully, falsely, and knowingly, misrepresented material facts in writing that relate to the character and quality of the Products. Specifically, Defendant intentionally and willfully misrepresented certain benefits and performance characteristics of the Products in various media advertising and at point of sale materials disseminated or caused to be disseminated by Defendant.

97.     Defendant also made intentional misrepresentations to Class Members who sought to have Defendant honor the warranty. Defendant represented to Class Members, by affirmative misrepresentations and omissions, that the Products provide benefits over and above what could actually be achieved, even though Defendant has no competent, credible, and reliable scientific evidence that is sufficient in quality and quantity, based on standards generally acceptable in the relevant scientific fields, when considered in light of the entire body of relevant and reliable scientific evidence, to substantiate its claims regarding the superior effectiveness of the Products.

–21–

98.    Defendant's uniform written misrepresentations were made with the intent that the general public, including Plaintiffs and Class, would rely upon them. Defendant's representations were made with knowledge of the falsity of such statements, or in reckless disregard of the truth thereof, and gave Defendant an unjust advantage and caused a loss to Plaintiffs and Class Members. Defendant's claims of superior effectiveness are so central to the consumer's selection of the Products that the Defendant knew and intended that consumers would rely on those misrepresentations in determining whether to purchase the Products.

99.    In actual and reasonable reliance upon Defendant's misrepresentations, Plaintiffs and Class Members purchased the Products for their intended and reasonably foreseeable purposes. Plaintiffs and Class Members were unaware of the true facts concerning the effectiveness of the Products, which were concealed from Plaintiffs and the Class Members. If Plaintiffs and Class Members had been aware of these concealed facts, Plaintiffs and Class Members would not have purchased the Products. Plaintiffs' and Class Members' reliance on the representations of the Defendant was reasonable.

100.    Defendant misrepresented material facts with the intent to defraud Plaintiffs and the Class Members. Plaintiffs and the Class Members were unaware of the intent of Defendant and relied upon these representations in agreeing to purchase the Products.

101.    In actual and reasonable reliance upon Defendant's misrepresentations, Plaintiffs and Class Members purchased the Products and did not benefit from the Products as represented, the direct and proximate result of which was injury and harm to Plaintiffs and Class Members because:

   a.    they would not have purchased the Products if the true facts concerning their effectiveness had been known; and

–22–

b.      the Products did not (and cannot) perform as promised.

## COUNT III

### VIOLATION OF NEW YORK CONSUMER PROTECTION FROM DECEPTIVE ACTS AND PRACTICES, GEN. BUS. § 349, AND NEW YORK FALSE ADVERTISING ACT, GEN. BUS. § 350 (On Behalf of the New York Subclass)

102.    Plaintiff Segovia, individually and on behalf of all others similarly situated, readopts and incorporates by reference the allegations contained in paragraphs 1 through 82 as though fully set forth herein.

103.    Defendant's actions complained of herein constitute unlawful deceptive trade practices under New York General Business Law § 349 and violate the New York False Advertising Act, New York General Business Law § 350 (collectively, "New York Consumer Protection Laws" or "NYCPL"). These acts protect consumers from deceptive acts or practices and false advertising in the conduct of any business, trade, or commerce in the State of New York.

104.    Plaintiff Segovia and New York Subclass are consumers and the end users and intended beneficiaries of the Products.

105.    At all times relevant to this Complaint, Defendant has been engaged in consumer-oriented conduct within the intended ambit of the NYCPL. As the manufacturer, advertiser, and seller of the Products to the consuming public throughout the United States, including within New York, Defendant's conduct affects similarly situated consumers and has a broad impact on consumers at large.

106.    Defendant knowingly misrepresented and intentionally omitted and concealed material information regarding the Products by misstating and/or failing to disclose to Plaintiff Segovia and the New York Subclass the known inefficacy of lactase and Aminogen® (in the

amount actually contained in the Products) as "enhancements" to the Products.

107.    Defendant also engaged in materially misleading deceptive acts and practices by continuing to promote the Products' Aminogen® and lactase content with knowledge that these "enhancements" would not perform as represented.

108.    Defendant's actions constitute unconscionable commercial practices, deception, fraud, false pretenses, misrepresentation, and/or the knowing concealment, suppression, or omission of materials facts, with the intent that others rely on such concealment, suppression, or omission, in connection with the sale and use of the Products, in violation of NYCPL § 349.

109.    Furthermore, Defendant's actions constitute the materially misleading advertising—which encompasses advertising, including labeling, that is false, deceptive, or fails to reveal materials facts—of commodities, in violation of NYCPL § 350.

110.    Defendant violated the NYCPL by knowingly and falsely advertising and representing that the Products provide certain benefits and performance characteristics, when Defendant knew that there was no scientific basis for these claims.

111.    Defendant's deceptive and misleading advertising and representation are material, in that they are likely to mislead a reasonable consumer acting reasonably under the circumstances. Potential purchasers might reasonably rely on Defendant's statements with respect to the benefits of the Products' additional ingredients, as the falsity of these statements cannot be ascertained absent complex scientific knowledge regarding clinically effective Aminogen® dosage amounts and the protein digestion process.

112.    Had Defendant refrained from the actions complained of herein—by either removing the offending references to Aminogen® and lactose or disclosing the true nature and function of these ingredients—Plaintiff Segovia would not have purchased (or would have paid

less for) the Products.

113.     Defendant's deceptive and misleading actions and omissions as set forth herein have caused and continue to cause injury to Plaintiff Segovia, New York Subclass Members, and the broader public and public interest.

114.     As a direct and proximate result of Defendant's violations of the NYCPL, Plaintiff Segovia and the New York Subclass have suffered and continue to suffer damages.   Plaintiff Segovia and New York Subclass Members are entitled to compensatory damages, equitable and declaratory relief, costs, and reasonable attorney's fees.


### COUNT IV

**VIOLATION OF THE FLORIDA DECEPTIVE AND
UNFAIR TRADE PRACTICES ACT
FLORIDA STATUTES §§501.201 *et seq.*
(On Behalf of the Florida Subclass)**

115.     Plaintiff Hermida, individually and on behalf of all others similarly situated, readopts and incorporates by reference the allegations contained in paragraphs 1 through 82 as though fully set forth herein.

116.     This is action is brought to secure redress for the unlawful, deceptive and unfair trade practices perpetrated by Defendant on behalf of Plaintiff Hermida and the Florida Subclass.

117.     The Florida Deceptive and Unfair Trade Practices Act (FDUTPA), Florida Statutes § 502.201, *et seq.*, was enacted to protect the consuming public and legitimate business enterprises from those who engage in unfair methods of competition and unconscionable, deceptive or unfair acts or practices in the conduct of any trade or commerce.

118.    Plaintiff Hermida and all Florida Subclass Members are "consumers" and the transactions at issue in this complaint constitute "trade or commerce" as defined by Florida Statutes § 501.203 (7) and (8) respectively.

119.    Defendant's actions, as alleged herein, constitute affirmative acts or representations, including unconscionable commercial practices, deception, fraud, false pretense, false promise, and/or misrepresentation, and are therefore unlawful under FDUTPA.

120.    When a FDUTPA claim is based on an affirmative act or representation, neither intent to deceive by Defendant nor actual reliance by Plaintiff Hermida or the Florida Subclass need be shown.

121.    Defendant's actions, as alleged herein, constitute knowing omissions and are therefore unlawful under FDUTPA.

122.    Plaintiff and the Florida Subclass reasonably and justifiably relied on Defendant's deceptive, unfair, fraudulent misrepresentations, as alleged herein.   Prospective purchasers, including Plaintiff Hermida and the Florida Subclass, were certain to be deceived because Defendant knowingly failed to disclose the source, affiliation, origin, characteristics, ingredients, standards and quality of the Products.   Defendant's business practices, in the advertising, marketing, packaging, labeling and sales of the Products as unique and superior products justifying substantially higher prices over alternative protein supplements, is an unconscionable, unfair, and deceptive act or practice in violation of the FDUTPA.

123.    As a direct and proximate result of Defendant's unlawful acts and omissions, Plaintiff Hermida and the Florida Subclass have suffered an ascertainable loss of money or property, in that they would not have purchased the Products but for Defendant's material omissions and affirmative acts or representations in connection with the marketing, advertising, and sale of the Products.

124.    Plaintiff Hermida and the Florida Subclass Members are entitled to compensatory damages, equitable and declaratory relief, costs, and reasonable attorney's fees.

## COUNT V

### UNJUST ENRICHMENT
### (On Behalf of the National Class or, alternatively, the New York and Florida Subclasses)

125.    Plaintiffs, individually and on behalf of all others similarly situated, readopt and incorporate by reference all allegations contained in paragraphs 1 through 82 as though fully set forth herein.

126.    Plaintiffs and Class conferred a tangible economic benefit upon Defendant by purchasing the Products.  Plaintiffs and Class Members would have expected remuneration from Defendant at the time this benefit was conferred had they known that the Products did not perform as promised.

127.    As a result of Defendant's deceptive, fraudulent, and misleading packaging, advertising, marketing, and sales of the Products, Defendant was enriched, at the expense of the Plaintiffs and Class Members, through their payment of the Products' purchase prices.

–27–

128.    Under the circumstances, it would be against equity and good conscious to permit Defendant to retain the ill-gotten benefits that it received from Plaintiffs and Class Members in light of the fact that the Products purchased by Plaintiffs and Class Members are not as Defendant purports them to be, as set forth more fully above.

129.    It would thus be unjust and inequitable for Defendant to retain the benefit without restitution or disgorgement of monies paid to Defendant for the Products, or such other appropriate equitable remedy as appropriate, to the Plaintiffs and other Class Members.

## COUNT VI

### INJUNCTIVE RELIEF
### (On Behalf of the National Class or, alternatively, the New York and Florida Subclasses)

130.    Plaintiffs, individually and on behalf of all others similarly situated, readopt and incorporate by reference all allegations contained in paragraphs 1 through 82 as though fully set forth herein.

131.    Defendant has refused to act on grounds generally applicable to Plaintiffs and Class Members, thereby making final injunctive relief appropriate.

132.    Defendant's conduct, as more fully set forth herein, both in the past and through the present day, has demonstrated a willful disregard for proven scientific facts in a clear attempt to sell Products that are no more effective than other, less expensive products.

133.    Defendant persists in its deceptive and unfair marketing and sales practices concerning the Products, to the detriment of consumers across the country.

134.    If Defendant is allowed to continue with these practices, consumers—Plaintiffs and other Class Members—will be irreparably harmed in that they do not have a plain, adequate, speedy, or complete remedy at law to address all of the wrongs alleged in this Complaint, unless injunctive relief is granted to stop Defendant's improper conduct concerning its marketing and sale of the Product.

135.    Plaintiffs and the other Class Members are therefore entitled to an injunction requiring Defendant to cease and to remedy the effects of its unfair and deceptive practices relating the marketing sale of the Products, as alleged herein, including the effects thereof.

136.    Plaintiffs seek a Court Order requiring Defendant to do the following:

      (a)    discontinue advertising, marketing, packaging and otherwise representing its Products as being superior to conventional products;

      (b)    undertake an immediate public information campaign to inform the Plaintiffs and Class Members of the truth about Defendant's Products and Defendant's prior practices relating thereto; and

      (c)    correct any erroneous impression the Plaintiffs and Class Members may have derived concerning the nature, characteristics, or qualities of the Products, including without limitation, the placement of corrective advertising and providing written notice to the general public.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs Edwin Segovia and Junior Hermida, on behalf of themselves and other members of the Classes described in this Complaint, respectfully request that:

      A.    the Court certify the Class pursuant to Fed. R. Civ. P. 23(b)(2) and (b)(3), and adjudge Plaintiffs and their counsel to be adequate representatives thereof;

      B.    the Court enter an Order requiring Defendant to pay Plaintiffs' and other Class Members' economic, monetary, actual damages (including multiple damages), consequential, compensatory, or statutory damages, whichever is greater; and, awarding Plaintiffs

and the other Class Members exemplary damages, to the extent permitted under the laws of each of the states implicated in this action;

        C.       the Court enter an Order awarding restitution and disgorgement of Defendant's revenues arising from its conducts alleged above, or any other appropriate remedy in equity, to Plaintiffs and other Class Members;

        D.       the Court enter an Order awarding injunctive relief as permitted by law or equity, including enjoining Defendant from continuing the unlawful practices set forth above and directing Defendant to cease its deceptive and misleading marketing campaign concerning the Products and to disgorge all monies Defendant acquired by means of any act or practice declared by this Court to be wrongful;

        E.       the Court enter and Order awarding Plaintiffs, individually and on behalf of the other Class Members, their expenses and costs of suit, including reasonable attorneys' fees and reimbursement of reasonable expenses, to the extent provided by the law;

        F.       the Court enter an Order awarding to Plaintiffs individually and on behalf of the other Class Members, pre- and post-judgment interest, to the extent allowable; and

        G.       for such other and further relief as may be just and proper.

**JURY DEMAND**

Pursuant to Federal Rules of Civil Procedure 38(b), Plaintiffs Edwin Segovia and Junior

Hermida hereby demand a trial by jury of all claims in this Class Action Complaint so triable.

DATED: August 29, 2014

Respectfully submitted,

By:

Peter J. Cambs
Bar Roll No. PC-6655
PARKER WAICHMAN LLP
6 Harbor Park Drive
Port Washington, NY 11050
Ph: (516) 466-6500
Fax: (516) 466-6665
pcambs@yourlawyer.com

Jordan L. Chaikin (*Pro Hac Vice Forthcoming*)
PARKER WAICHMAN LLP
27300 Riverview Center Blvd, Suite 103
Bonita Springs, FL 34134
Ph: (239) 390-1000
Fax: (239) 390-0055
jchaikin@yourlawyer.com

Jonathan Shub
SEEGER WEISS LLP
77 Water Street
New York, NY 10005
Ph: (215) 564-2300
Fax: (215) 851-8029
jshub@seegerweiss.com

Nick Suciu III (*Pro Hac Vice Forthcoming*)
BARBAT, MANSOUR & SUCIU PLLC
434 West Alexandrine #101
Detroit, MI 48201

Ph: (313) 303-3472
Fax: (248) 698-8634
Nicksuciu@bmslawyers.com

*Attorneys for Plaintiffs and the*
*Putative Classes*